UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

T. FORCHT DAGI, M.D.,            )
                                )
            Plaintiff,           )    CIVIL ACTION NO.
                                )    18-11432-DPW
v.                              )
                                )
DELTA AIR LINES, INC.           )
                                )
            Defendant.          )

MEMORANDUM AND ORDER
December 11, 2018

At issue in the motion to dismiss before me is whether the
two-year statute of limitations under the Convention for the
Unification of Certain Rules for International Carriage by Air,
May 28, 1999, S. Treaty Doc. No. 106-45 (entered into force Nov.
4, 2003) (the "Montreal Convention") forecloses a passenger's
claim against an airline.  The passenger's overnight flight took
off from Boston on March 30, 2015, arriving in London on March
31, 2015, where the passenger says he was confined without
justification[1] by Delta employees at Heathrow Airport.  The

---

[1] I share the concern of the Reporter to an ongoing Restatement
of the Law (Third) Torts project that conventional nomenclature
for the torts of false imprisonment and, derivatively, false
arrest may be confusing or misleading.  *See generally* RESTATEMENT
(THIRD) TORTS: INTENTIONAL TORTS TO PERSONS § 7 Reporter's Notes cmt. a
(AM. LAW INST., Tentative Draft No. 3, 2018) (false imprisonment);
*see also id.* at § 9 Reporter's Notes cmt. c ("Wrongful or
'false' arrest is generally treated as a subcategory of false
imprisonment, with the same legal requirements except that
wrongful arrest involves taking a person into custody.")  At the

passenger did not commence this action based on that confinement until March 28, 2018, nearly three years after the incident. If the Montreal Convention applies, this suit is time barred.

Concluding that the Montreal Convention applies because the personal injury alleged by plaintiff did not extend beyond his disembarkation process and, consequently, that potentially applicable municipal law — which would provide a more generous limitation period of not less than three years — is preempted by the international law regime of the Montreal Convention, I will allow the motion to dismiss.

## I. LEGAL LANDSCAPE

An international air carriage and transportation convention[2] embodies an international agreement designed to ensure

_____

outset, I have sought to characterize more precisely the specifically relevant issues, "confinement" and "justification" or privilege at the heart of the complaint before me. Greater doctrinal precision seems especially important in framing my approach to the claims of "false [or 'wrongful'] imprisonment" and "false arrest" asserted by conventional name in plaintiff's complaint since those claims may need to be addressed under the personal injury law of one or another of several different liability regimes: the Montreal Convention, the municipal law of England, or the municipal law of Massachusetts.

[2] Consideration of the case law regarding two international air carriage Conventions is appropriate, although only the Montreal Convention is directly applicable in this case. The Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934) ("Warsaw Convention") was the Montreal Convention's predecessor. As a result, courts rely on case law arising from the Warsaw Convention in interpreting the Montreal Convention when the provisions of the two Conventions are essentially the same. *See, e.g.*, *Narayanan* v. *British Airways*,

"protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution" while at the same time maintaining the goal of assuring "limited and predictable damage awards for airlines." *Sompo Japan Ins., Inc.* v. *Nippon Cargo Airlines Co., Ltd.,* 522 F.3d 776, 781 (7th Cir. 2008) (quoting *Ehrlich* v. *Am. Airlines, Inc.*, 360 F.3d 366 (2d Cir. 2004)). Such a convention provides the sole basis for recovery for bodily injury to passengers and "precludes a passenger from maintaining an action for personal injury damages under local law when [his] claim does not satisfy the conditions for liability under the Convention." *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U.S. 155, 176 (1999).

Under Art. 17, ¶ 1 of the Montreal Convention, a "carrier is liable for damage sustained in case of . . . bodily injury of a passenger upon condition only that the accident which caused the . . . injury took place on board the aircraft or in the

_____

747 F.3d 1125, 1127 n.2 (9th Cir. 2014) ("Although designed to replace the Warsaw Convention, the Montreal Convention incorporates many of its substantive provisions. Accordingly, in interpreting the Montreal Convention, courts have routinely relied upon Warsaw Convention precedent where the equivalent provision in the Montreal Convention is substantively the same.") (citations omitted). I follow that interpretive approach in this Memorandum and will not separately identify the specific Convention considered in the relevant case law I discuss, except where the provisions under consideration require Convention-specific discussion.

course of any of the operations of embarking and disembarking."

Under Art. 35, ¶ 1 of the Montreal Convention, "[t]he right to

damages shall be extinguished if an action is not brought within

a period of two years, reckoned from the date of arrival at the

destination . . . ."

If the injury alleged is within the scope of Art. 17, ¶ 1,

the Convention's statute of limitations (Art. 35, ¶ 1) will bar

Dr. Dagi's claim.  In that circumstance, there will be no need

for further recourse to choice-of-law analysis regarding

alternative statutes of limitation.[3]  The precise factual focus

---

[3]  The preemptive effect of the Montreal Convention is the sole
source of any time bar to Dr. Dagi's complaint.  Absent the
preemptive effect of the Convention, a federal court sitting in
diversity would otherwise apply the choice-of-law rules of the
forum state.  *See Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S.
487, 496-497 (1941).  Thus, I would ordinarily look to
Massachusetts choice-of-law principles as the law of the forum
state here to determine the applicable statute of limitations.
The Massachusetts statute of limitations for false imprisonment
and false arrest is three years.  Mass. Gen. Laws ch. 260, § 4.
But Massachusetts choice-of-law jurisprudence takes a
"functional approach" that follows the teachings of the RESTATEMENT
(SECOND) CONFLICT OF LAWS § 142 (AM. LAW INST. 1971).  *See Nierman* v.
*Hyatt Corp.*, 808 N.E.2d 290, 292 (Mass. 2004).  Under § 142, the
Massachusetts statute of limitations would apply unless "the
claim would be barred under the statute of limitations of a
state bearing a more significant relationship to the parties and
the occurrence."  RESTATEMENT (SECOND) CONFLICT OF LAWS, § 142(2)(b).
It appears that England would have a more significant
relationship than Massachusetts to the occurrence at issue here.
And the statute of limitations for torts in England is six
years, twice that of Massachusetts. *See* Limitations Act 1980, c.
58, § 2 (Eng.).  Thus, in either case, the potentially
applicable municipal law would not bar Dr. Dagi's action.  As
this Memorandum and Order explains, however, municipal law is
preempted, in any event, by the Montreal Convention.

4

is on whether Dr. Dagi's alleged injury on March 31, 2015 occurred "in the course of any of the operations of . . . disembarking."  Art. 17, ¶ 1.

## II. FACTUAL BACKGROUND

The facts alleged in the operative complaint can be summarized briefly; they are recited more fully when relevant to the analysis in Section III of this Memorandum.

As the aircraft on which the plaintiff, T. Forcht Dagi, M.D., began descent to Heathrow Airport, the bag of a Delta airline flight attendant (the "Attendant") was reported over the aircraft intercom as having disappeared.  The Attendant loudly and falsely accused Dr. Dagi of stealing the bag.  Dr. Dagi's onboard luggage was searched by the Attendant, but the missing bag was found elsewhere on the plane.  The Attendant then "loudly accused" Dr. Dagi of "probably" having "thrown" the bag to the other location.

Once the aircraft landed, the Attendant prevented Dr. Dagi from leaving the aircraft before the other passengers.  Upon reaching the mobile section of the Jetway connecting the aircraft to the terminal, the Attendant directed a uniformed Delta ground employee to detain Dr. Dagi and turn him over to authorities.  The Attendant ordered Dr. Dagi to surrender his passport to the Delta ground employee.

The Delta ground employee then ordered Dr. Dagi to follow
her to another location within the Heathrow Airport terminal
until the police arrived.  This involved a walk of ten to
fifteen minutes to a location four hundred yards from the
aircraft and the Jetway.  The terminal through which Dr. Dagi
was marched was not itself leased or under the control of Delta;
it was also utilized by other airlines and their passengers.
Dr. Dagi was subject to the sole direction of Delta employees
during his relevant passage through the terminal.  Following the
initial walk through the terminal, Dr. Dagi was marched back to
the vicinity of the aircraft where he was handed over to a Delta
supervisor.  Dr. Dagi, who was recovering from leg surgery,
suffered significant pain while being forced to transport his
carry-on luggage without assistance.

After the Delta supervisor to whom Dr. Dagi was delivered
talked with a British police officer by phone, the phone was
turned over to Dr. Dagi who was interviewed by the police
officer.  Following this phone interview, the police officer
told Dr. Dagi he was free to go, and he proceeded through
immigration without further restraint by Delta employees.

### III. ANALYSIS

For purposes of determining whether claims arise from "any
of the operations of . . . disembarking," Art. 17, ¶1, under the
Montreal Convention, the First Circuit has outlined a "three-

pronged inquiry" involving evaluation of "(1) the passenger's activity at the time of injury, (2) his or her whereabouts when injured, and (3) the extent to which the carrier was exercising control at the moment of injury." *McCarthy* v. *Nw. Airlines, Inc.*, 56 F.3d 313, 317 (1st Cir. 1995). The *McCarthy* court stated that it did "not view the three factors—activity, location, and control—as separate legs of a stool, but, rather, as forming a single, unitary base. In the last analysis, the factors are inextricably intertwined." *Id.* The First Circuit identified in particular the role of "control" as "an integral factor in evaluating both location and activity." *Id.* (quoting *Evangelinos* v. *Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir. 1977) (en banc)).

Review of a pair of illustrative cases involving embarkation will be helpful in getting a sense for how courts construe the terms "embarking" and, by implication, "disembarking."

*Day* v. *Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975) involved injuries from terrorist acts of shooting and throwing grenades at passengers waiting in line to board the defendant's airliner. *Id.* at 32. The Second Circuit held that the passengers were "embarking" at the time of the attack because they had:

already surrendered their tickets, passed through passport control, and entered the area reserved exclusively for those about to depart on international flights. They were assembled at the departure gate, virtually ready to proceed to the aircraft. The passengers were not free agents roaming at will through the terminal. They were required to stand in line at the direction of TWA's agents for the purpose of undergoing a weapons search which was a prerequisite to boarding.

*Id.* at 33.

By contrast, in *McCarthy*, the plaintiff, due to her tardy arrival at the airport for her flight, was escorted by an airline agent through the airport terminal to the international boarding area. 56 F.3d at 314. While the plaintiff was descending an escalator before reaching that area, the escalator malfunctioned and she fell breaking her knee. *Id.* She sued the airline. The First Circuit held the plaintiff was not "embarking" because she had yet to fulfill most of the conditions of boarding (e.g., she had not reached the area restricted for travelers), was not under the defendant's control, and was too remote "temporally and spatially" from the act of embarking. *Id.* at 317-18.

With that general framework in mind, I now turn to unbundling the three distinctive factors identified by the First Circuit for consideration in the analytical process. It must bear reemphasis, however, that these factors should

not be conceived as separate strands, but rather are

"inextricably intertwined." *Id.* at 317.

## A.   *Location*

The relevant locational facts, as alleged, began onboard

the aircraft with the initial accusation by the Attendant.  Dr.

Dagi avers that "[o]nce the Aircraft landed, the Attendant

prevented the Plaintiff from leaving the Aircraft before the

other passengers had done so."  This allegedly tortious conduct

then continued on the Jetway, which "connect[s] the Aircraft to

the Terminal."  It was from that point other airline employees

took Dr. Dagi on a walk of ten to fifteen minutes duration

through the terminal to a point approximately 400 yards away,

kept him at that location for 15 minutes, and then escorted him

on another walk of ten to fifteen minutes back to the vicinity

of the aircraft.

The location of the alleged incident through the terminal

justifies classifying it as occurring during disembarking.

In *MacDonald* v. *Air Canada*, 439 F.2d 1402, 1405 (1st Cir.

1971), before the First Circuit in *McCarthy* outlined the three

factors to guide analysis, the court deployed a bright-line test

focusing on location where the court stated "it would seem that

the operation of disembarking has terminated by the time the

passenger has descended from the plane by the use of whatever

mechanical means have been supplied and has reached a safe point

inside of the terminal . . . ." *Id*. Even using that

mechanistic formulation, it is clear that Dr. Dagi here was

still disembarking when he left the Jetway connection between

the plane and the terminal because he remained under the

supervision and express control of Delta employees who directed

him to points, safe or otherwise, of their choice within the

terminal.

Spatially, the relevant events began on and continued

seamlessly at Delta's direction directly from the aircraft and

then back to its vicinity during the process of disembarkation.

Temporally, the events in question began on the aircraft

and unfolded in an unbroken chain until the police officer

terminated the airline's direction and control. There was no

intervening period between Dr. Dagi leaving the aircraft itself

and the alleged tortious conduct. Instead the tortious conduct

involved a continuous course of conduct of slightly less than an

hour that began with directions inside the cabin of the plane

and ended within the terminal, just a walking distance away from

the aircraft.[4]

_____

[4] Dr. Dagi, in his opposition to the motion to dismiss, attempts
to split his claims against Delta into separate actionable
pieces subject to the law of separate jurisdictions by arguing
that once he had reached the Jetway, Delta's actions became
actionable under the law of England. This approach would avoid
the Convention's statute of limitations bar for conduct
thereafter.
    I conclude Delta's alleged tortious activity as alleged,

10

As is apparent, and as anticipated by the First Circuit in *McCarthy*, the factor of control is intertwined with the factor of location. 56 F.3d at 317. Thus, where an airline continues to wield effective control over an individual even at some distance from the curtilage of the airplane, disembarkation may still be occurring. While the concept of control will be separately discussed below, it is important to observe at this point that Dr. Dagi admits to being in the uninterrupted and exclusive control of Delta on the plane, on the Jetway, and in the terminal until told by the police he could go on his way. *See, e.g.,* Amended Complaint [Dkt. No. 5 at ¶¶ 25, 27, 28, 33-35, 38, 42, 46-49, 52, 60] (notably, the Plaintiff uses the words "detention," "custody," "duress," and "forced" in his complaint which all denote determinative degrees of control). The determinative control Delta is alleged to have had over Dr. Dagi suffuses the "location" and related "duration" analysis.

---

however, took place during "the operations of disembarking" in a single, continuous course of conduct that began in the cabin of the airplane and continued through the Jetway and into the terminal until supervening direction by the police officer left Dr. Dagi free to leave Delta's control. Dr. Dagi's effort to transmute his claims into more than one cause of action (i.e., pre-Jetway, presumably governed by the Montreal Convention, and post-Jetway, presumably covered by the law of England) to avoid the preemptive effect of the Montreal Convention (and its associated statute of limitations) for the post-Jetway operations distorts beyond recognition the gravamen of the single tort by a single defendant alleged in the factual assertions of the Amended Complaint.

The exercise of control by Delta undergirds the role of location and duration in supporting the classification of the conduct as occurring during disembarkation operations.

To use the words of *McCarthy*, the incidents alleged were never "far removed" from the threshold point in the process of disembarkation, 56 F.3d at 318; instead, they were inextricably connected both temporally and spatially to Dr. Dagi's ongoing process of disembarking from the airplane. *Id.*

**B. *Activity at Time of Injury***

The activity in which Dr. Dagi was compelled to be engaged at the time of the injury is plainly material to the question whether he was a passenger still engaged by the operations of disembarking and thus subject to the Montreal Convention. The case law outlines the relevant boundaries for embarkation and disembarkation operations. *Compare Schroeder* v. *Lufthansa German Airlines,* 875 F.2d 613, 618 (7th Cir. 1989) ("[Police were] questioning Schroeder about a bomb threat. This activity is not even remotely related to a passenger's embarking or disembarking from an airplane."), and *Martinez Hernandez* v. *Air France,* 545 F.2d 279, 282 (1st Cir. 1976) ("[T]he passengers had already emerged from the aircraft, descended the stairs from the plane to the ground, traveled via bus or foot from the plane to the terminal, and presented their passports to the Israeli authorities. On these facts we do not believe it can be said

12

that the passengers were still engaged in any activity relating to effecting their separation from the aircraft."), *with Marotte v. Am. Airlines, Inc.,* 296 F.3d 1255, 1260 (11th Cir. 2002) ("[T]he party had their boarding passes in hand and were attempting to board the plane when the attack took place."), and *Day,* 528 F.2d at 33 ("[T]he plaintiffs had already surrendered their tickets, passed through passport control, and entered the area reserved exclusively for those about to depart on international flights. They were assembled at the departure gate, virtually ready to proceed to the aircraft.")

Here, Dr. Dagi alleges he was falsely imprisoned when he was disembarking. To be sure, the aircraft's journey had ended and Dr. Dagi wanted to get on with his activities in England. But the relevant events started on the aircraft, proceeded into the disembarkation process, and had not yet resulted in Delta surrendering him to either the police or immigration authorities. This is not a circumstance, like *Schroeder* or *Martinez*, where a plaintiff had moved on to activities uncontrolled by the airline or its agents following disembarkation operations.

## C.   *Control*

In his opposition to Delta's motion to dismiss, Dr. Dagi concedes that he was "under the control of the airline during

13

the entire duration of his detention . . . ."[5]  However, he

suggests, without authority, that this is not the "control" with

which *McCarthy* was concerned.  Rather, he contends that the

*McCarthy* control factor is concerned with the passenger's

interaction with the airline in the routine course of events

while disembarking at a particular terminal.

Dr. Dagi's argument is unpersuasive for three basic

reasons.

First, his suggested definition of "control" does not

conform to the ordinary meaning of the word in English or

American dictionaries.  The word "control" is not limited

to "routine" circumstances.  In the Oxford English

Dictionary, the word control means in this context "[t]he

---

[5] This circumstance effectively distinguishes Dr. Dagi's case
from other disembarkation cases in which under settled case law
a plaintiff's passage through the terminal after emerging from
the aircraft was held not to be part of the airline's operations
of disembarkation.  *See, e.g.*, *Elnajjar* v. *Northwest Airlines,
Inc.*, 2005 WL 1949545, at *4 (S.D. Tex. Aug 15, 2005) ("'[F]alse
imprisonment' . . . entailed the direction of law enforcement
officials, not just Defendant's agent."); *Alleyn* v. *Port
Authority of N.Y. & N.J.*, 58 F. Supp. 2d 15, 20-21 (E.D.N.Y.
1999) (citing cases where plaintiffs "unaccompanied by airline
personnel" and cases where "the airlines were no longer exerting
control over the plaintiffs or the area of the terminal where
the plaintiffs were injured."); *Knoll* v. *Trans World Airlines,
Inc.*, 610 F. Supp. 844, 847 (D. Colo. 1985) ("Plaintiffs
remaining activities (e.g. immigration, customs) were not
conditions imposed by the airline for her disembarking."));
*Curran* v. *Aer Lingus*, No. 81 Civ. 4590, 1982 U.S. Dist. LEXIS
15937, at *6-7 (S.D.N.Y. Sept. 28, 1982) (restrictions on
plaintiff "imposed by customs, not Aer Lingus.").

act or power of directing or regulating; command,

regulating influence." *Control*, The New Shorter Oxford

English Dictionary (4th ed. 1993).  The American usage of

the word is similarly defined.  *Control*, American Heritage

Dictionary (4th ed. 2000) ("To exercise authoritative or

dominating influence over; direct.")  To redefine the word

as suggested by Dr. Dagi would be to introduce without

justification an anomalous linguistic limitation to the

scope of the Montreal Convention and to the First Circuit's

opinion in *McCarthy*.

Second, Dr. Dagi suggests that a broad definition of

control would be "pernicious" because it would "empower an

airline, with legal impunity under both the Convention and local

law, to detain an arriving passenger at any location of its

choosing in an arrival 'secure area,' and, further, to do so for

as long as is its pleasure."  Other courts have rejected such

"policy" arguments for ignoring the plain understandings reached

in the Convention.  I do so as well.  The definition and its

implications are part and parcel of the choices made by the

drafters.  *See, e.g.*, *King* v. *Am. Airlines, Inc.,* 284 F.3d 352,

362 (2d Cir. 2002) (Sotomayor, J.) ("It is not for the courts to

rewrite the terms of a treaty between sovereign nations."

Instead, it is the court's "responsibility to give the specific

words of the treaty a meaning consistent with the shared

expectations of the contracting parties.") (quoting *Air France* v. *Saks*, 470 U.S. 392, 399 (1985)).

Third, it appears Dr. Dagi overstates the restrictions on recovery from the airline, and hence the deterrent effect of litigation for damages, if timely brought under the Montreal Convention. Because, as alleged, the claim is based on the wrongful acts of the airline's servants or agents and not on acts of a third party, under the Montreal Convention, the strict liability damages limit under Art. 21, ¶ 1 could have been exceeded to the extent Dr. Dagi could prove such damages. *Id.* at ¶ 2. Thus, reference in the case law regarding the manner in which "the Convention *massively* curtails damage awards . . . ," *Turturro* v. *Continental Airlines*, 128 F. Supp. 2d 170, 181 (S.D.N.Y. 2001) (emphasis supplied), appears, on closer analysis, to involve damage limitations for harm caused by third parties and/or the more restrictive damage limitation regime of the Warsaw Convention.

Under any of the three potentially applicable regimes for liability, Dr. Dagi likely would have been able to recover for his physical injuries and associated mental suffering. *See, e.g.*, *Ehrlich* v. *Am. Airlines, Inc.*, 360 F.3d 366, 385 (2d Cir. 2004) (Convention permits passengers to hold a carrier liable for a mental injury causally connected to a bodily injury); *Foley* v. *Polaroid Corp.*, 508 N.E.2d 72, 78 (Mass. 1987)

16

(plaintiff in false imprisonment case may recover "such damages as are the direct result of the defendant's wrongful conduct," including compensatory damages for "indignity, humiliation and mental suffering, and shame and anguish of mind"); James Edelman, *McGregor on Damages* 1664, 1667-68 (20th ed. 2018) (referencing English case law dealing with false imprisonment providing recovery for physical injury, psychological harm, and humiliation).

As alleged, the complaint before me does not present the severe limitation of denial of recovery under the Montreal Convention for personal injury not involving bodily injury. *See E. Airlines, Inc.* v. *Floyd*, 499 U.S. 530, 551-52 (1991). Whatever the fate of a pure dignitary personal injury claim under the Montreal Convention, this case presents a compensable bodily injury claim in which associated mental suffering damages would be recoverable.

Moreover, if English municipal law applied (as Dr. Dagi appears to suggest), Dr. Dagi's quantum of recovery would likely be more modest than that which could be awarded by a United States jury (either pursuant to the Montreal Convention or Massachusetts municipal law). The English and Wales Court of Appeal has provided guidance for juries stating that basic damages (to compensate for the loss of liberty) of £500 for the first hour of false imprisonment is appropriate, with sums

awarded after the first hour to be awarded on a "reducing scale." *See Thompson* v. *Commissioner of Police of the Metropolis* [1998] Q.B. 498 (EWCA) 515. As alleged, the duration of the tort asserted by Dr. Dagi is no more than one hour. In addition to those relatively modest "basic damages," English juries may award "aggravated damages" (for example, humiliation) but these should generally not exceed twice the basic damages awarded. *Id.* at 516; *see also* Edelman, *McGregor on Damages, supra*, at 1667-68.

Dr. Dagi would not be able to recover punitive damages (referred to as "exemplary damages" in England) under the Montreal Convention. *See* Montreal Convention, Art. 29. That is similarly the law of England, *see Rookes* v. *Barnard* [1964] A.C. 1129 (HL) (limiting exemplary damages to three limited scenarios, none of which are applicable in Dr. Dagi's case), and Massachusetts. *See Aleo* v. *SLB Toys USA, Inc.,* 995 N.E.2d 740, 753 (Mass. 2013) ("Under Massachusetts law, punitive damages may be awarded only where authorized by statute.")

For all practical purposes, then, the Montreal Convention does not by terms categorically provide the potential for any less generous damage recovery than would the law of England or Massachusetts if, absent preemption, the municipal law supplied

by either of those jurisdictions were to govern this dispute.[6]

   In short, even if I were authorized — which I am not — to rewrite the terms of the Montreal Convention to avoid preemption and employ the substantive law of England or Massachusetts, it does not appear that any significant benefit involving more generous damages would accrue to Dr. Dagi.  Thus, by permitting the statute of limitations for the Montreal Convention to run, Dr. Dagi lost not only the right to pursue damages essentially no less generous than would have been available under the law of England or Massachusetts, he also lost the opportunity to deploy the Convention as a tool to deter airlines from the "pernicious" conduct of unlawfully and unreasonably detaining passengers during disembarkation operations.

---

[6] Massachusetts choice-of-law principles, otherwise applicable in this diversity action as the law of the forum, *Klaxon Co.*, 313 U.S. at 496-497, would likely apply § 146 of the RESTATEMENT (SECOND) CHOICE OF LAW.  *See Cosme* v. *Whitin Mach. Works, Inc.,* 632 N.E.2d 832, 835 (Mass. 1994); *Robidoux* v. *Muholland*, 642 F.3d 20, 25 (1st Cir. 2011).  Under § 146 of the Restatement, the law of England as the jurisdiction where the injury occurred, presumptively applies.  It does not appear, applying the principles stated in § 6 of the Restatement, that Massachusetts has a more significant relationship to the occurrence than England.  Thus, no argument based on § 6 appears available to overcome the presumptive application of the substantive law of England in this case, absent the preemptive effect of the Convention.  *See Cosme,* 632 N.E.2d at 647.  Presumably, this is why Dr. Dagi appears in his complaint principally to reference the law of England regarding false arrest and wrongful imprisonment.

### D.   Summary on Disembarkation

In summary, after evaluating the three-factor analysis directed by the First Circuit in *McCarthy*, I conclude that the factors considered separately and together require the incident be classified as occurring during "disembarking."  This case is clearly distinguishable from those dealing with passengers suffering injury during some part of their passage through an airport unrelated to the operations of embarking or disembarking.  Instead, here the acts as alleged arose on the plane near the end of the flight, continued after landing, and proceeded through the airline's Jetway into the terminal during which time Dr. Dagi was under the control of Delta employees who directed his movement from location to location at all points.  The alleged tortious conduct occurred during disembarkation operations for Dr. Dagi.  Liability is governed exclusively by the Montreal Convention.  Under the Montreal Convention, that liability was extinguished on March 31, 2017, two years after Dr. Dagi's arrival in London where he says the wrongful conduct took place.

### IV. CONCLUSION

Dr. Dagi's complaint must be read to allege that he was engaged in operations of disembarking at the time of the challenged conduct by Delta and its employees.  Dr. Dagi's municipal law claims are, therefore, preempted by the Montreal

Convention because the Convention's limitation provision extinguished the liability for the injury alleged in his complaint well before this action was filed.

Accordingly, Delta's motion [Dkt. No. 7] to dismiss based on the statute of limitations established by the Montreal Convention is hereby GRANTED and Delta's belated motion [Dkt. No. 16] to file an amended motion to dismiss is therefore treated as MOOT.  The Clerk shall terminate this case.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE